NORA J. CHOROVER (Bar No. 547352)
Stern, Shapiro, Weissberg & Garin, LLP
90 Canal Street, 5th Fl.
Boston, MA  02114
Phone:    617-742-5800
Fax:       617-742-5858

Attorneys for Plaintiff
CLEAN WATER ACTION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| CLEAN WATER ACTION,<br><br>               Plaintiff,<br><br>    v.<br><br>STATE LINE SCRAP CO., INC.,<br><br>              Defendant. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES**<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CLEAN WATER ACTION ("CWA") by and through its counsel, hereby alleges:

### INTRODUCTION

1. This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, et seq. (the "Clean Water Act" or "the Act"). Plaintiff seeks declaratory judgment, injunctive relief, and other relief the Court deems appropriate with regard to actions taken by State Line Scrap Co., Inc. ("State Line") which resulted in the discharge of stormwater runoff from the State Line site into waters of the United States, in violation of the Act.

2. Activities that take place at industrial facilities, such as material handling and storage, are often exposed to the weather.  As runoff from rain or snow melt comes into contact with these

materials, it picks up pollutants and transports them to nearby creeks, lakes, or wetlands. Stormwater pollution is a significant source of water quality problems for the nation's waters.

## JURISDICTION AND VENUE

3.	This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).

4.	On August 21, 2009, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Acting Administrator of EPA Region I; the Commissioner of the Massachusetts Department of Environmental Protection ("DEP"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A). A true and correct copy of CWA's notice letter is attached as Exhibit A, and is incorporated by reference.

5.	More than sixty days have passed since notice was served on Defendant and the state and federal agencies. Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the Commonwealth of Massachusetts has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

6.	Venue is proper in the District Court of Massachusetts pursuant to Section 505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district. Pursuant to Local Rule 40.1(D)(1)(b), this case is properly assigned to the Eastern Division, because both parties are located in Massachusetts, and Plaintiff is located within the Eastern Division.

## PARTIES

7.	Plaintiff CLEAN WATER ACTION ("CWA") is a nationwide non-profit public benefit corporation organized under the laws of the District of Columbia, with its main New England office located in Boston, Massachusetts. CWA has approximately 50,000 members who live, recreate and work in and around waters of the Commonwealth of Massachusetts, including in Attleboro, and in the vicinity of the Blackstone River and its tributaries. CWA is dedicated to working for clean, safe

2

and affordable water, the prevention of health-threatening pollution, the creation of of environmentally-safe jobs and businesses, and the empowerment of people to make democracy work.  To further these goals, CWA actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

8.    Members of CWA reside in the Attleboro area.  Members of CWA use and enjoy the Blackstone River and its tributaries for recreation, sightseeing, wildlife observation and/or other activities in the vicinity of and downstream of Defendant's discharges.  Members of CWA use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Members of CWA have a recreational, aesthetic and/or environmental interest in the Blackstone River and its tributaries.  The interests of CWA's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act.  The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

9.    Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and the citizens of the Commonwealth of Massachusetts, for which harm they have no plain, speedy, or adequate remedy at law.

10.   Defendant STATE LINE SCRAP CO., INC. is a corporation organized under the laws of the Commonwealth of Massachusetts that operates a scrap recycling facility in Attleboro.

## STATUTORY BACKGROUND

11.   <u>Pollutant Discharges in Violation of the Terms of an NPDES Permit are Illegal</u>.  The Clean Water Act makes the discharge of pollution into waters of the United States unlawful unless the discharge is in compliance with certain statutory requirements.  Among other things, Section 301(a), 33 U.S.C. § 1311(a), prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342., including the requirement that the discharge be permitted by the federal Environmental Protection Agency ("EPA") under the National Pollutant Discharge Elimination System ("NPDES").  Sections 301(a), 402(a) and 402(p) of the Act. 33 U.S.C. §§ 1311(a), 1342(a), 1342(p).

12.     <u>EPA Has Made Stormwater Discharges from Scrap Recycling Facilities Subject to the Requirements of EPA's General Industrial Stormwater Permit</u>.  In order to minimize polluted stormwater discharges from industrial facilities, the federal Environmental Protection Agency has issued a general industrial stormwater permit ("Stormwater Permit").  EPA's General Industrial Permit was first issued in 1995, and was reissued in 2000 and 2008.  <u>See</u> 60 Fed. Reg. 50804 (Sept. 29, 1995); 65 Fed. Reg. 64746 (Oct. 30, 2000); 73 Fed. Reg. 56572 (Sept. 29, 2008).  Scrap recycling facilities are subject to the requirements of this Stormwater Permit.  <u>See</u> Stormwater Permit, Appendix D, pg. D-4.  Scrap recycling facilities which carry on other types of activities also subject to the terms of the Stormwater Permit must also comply with any sector-specific requirements applicable to such co-located industrial activity.  Stormwater Permit, pg. 97.  Scrap recycling facilities may also apply for coverage under an individual permit.  40 CFR 122.26(c).  In order to discharge storm water lawfully in Massachusetts, industrial dischargers must comply with the terms of the Stormwater Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

13.     <u>Scrap Recycling Facilities Must Develop and Implement a Stormwater Pollution Prevention Plan (SWPPP)</u>.  An owner or operator (hereafter referred to as "operator") of a facility subject to the requirements of the Stormwater Permit must prepare a SWPPP before applying to EPA for coverage under the Stormwater Permit.  The SWPPP must be "prepared in accordance with good engineering practices," Stormwater Permit, pg. 17 (referring to "control measures"), and, among other things,

- identify potential sources of pollution at the facility;
- describe and ensure implementation of control measures that are technologically available and economically practicable and achievable in light of best industry practice;
- set forth specific procedures to assure compliance with effluent limitations and monitoring/inspection requirements of the Stormwater Permit.

<u>See</u> 40 CFR 122.26(c)(i); Stormwater Permit pgs. 12, 27-30.

14.     <u>Scrap Recycling Facilities Must Submit to EPA a Notice of Intent to Be Covered by the Stormwater Permit By EPA's Established Deadlines</u>.  After completing and implementing its SWPPP, scrap recycling facilities must submit to EPA a Notice of Intent to be covered by the Stormwater Permit.  EPA's initial NOI filing deadline was January 1, 1996.  <u>See</u> 60 Fed. Reg. 50804.

15.     <u>Scrap Recycling Facilities Must Comply with the Terms of the Stormwater Permit</u>.  The Stormwater Permit requires scrap metal facilities to, among other things:

- a. ensure that stormwater discharges meet applicable water quality standards, *see* Stormwater Permit, pg. 16;
- b. reduce and/or eliminate pollutants to the extent achievable using control measures (including best management practices) that are technologically available and economically practicable and achievable in light of best industry practice, *see* Stormwater Permit, pg. 12;
- c. implement specific best management practices set forth in the Stormwater Permit for scrap recycling facilities, *see* Stormwater Permit, pgs. 97-102;
- d. monitor stormwater discharges for compliance with benchmark limitations applicable specifically to scrap recycling facilities, *see* Stormwater Permit, pg. 102;
- e. report monitoring results to EPA by specified deadlines, *see* Stormwater Permit, pgs. 41-43;
- f. comply with any additional state requirements, *see* Stormwater Permit, pgs. 140-141.

16.     <u>Citizens may bring action to enforce these requirements</u>.  Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements and for unpermitted discharges of pollutants.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 a day for each violation on before

January 12, 2009, *see* 33 U.S.C. § 1319(d), 69 Fed. Reg. 7121 (Feb. 13, 2004), and up to $37,500 per day of violation for violations after that date. *See* 73 Fed. Reg. 75340 (Dec. 11, 2008).

## STATEMENT OF FACTS

17. Defendant operates a metals scrap recycling facility at 136 Bacon Street, So. Attleboro, MA (the "Site" or "Facility"). The Site falls within Standard Industrial Classification ("SIC") Code 5093. The Site covers approximately 13.5 acres, and is divided into multiple sections. The Site includes an Office and Upper Main Yard (2.8 acres), a Lower Main Yard (2.2 acres), Turner Street Main Yard (2.9 acres), Maintenance Yard (1.5 acres), South Yard (3.6 acres), and Truck Parking (.5 acres). Its operations include scrap metal recycling, processing and storage. The majority of scrap metal recycling, processing and storage at the Facility occurs outdoors.

18. Numerous activities at the Site take place outside and are exposed to rainfall. These activities include, but are not limited to, stockpiling and storage of scrap metals, materials loading and unloading, and scrap metal processing. Industrial machinery and heavy equipment, including trucks and fork lifts, are operated, maintained, or stored at the Site in areas exposed to storm water flows.

19. Among the sources of pollutants at the Facility are deteriorating and/or corroding stockpiled metal materials. Other sources of pollutants include leaking fluids from various parts – including automobile parts such as used engines and transmissions. Spills and leaks from equipment used to move materials around the Facility may also occur. Pollutants that may be discharged to the storm drains include (but are not limited to) PCBs, oil and grease, mercury, lubricants, paint pigments or additives, heavy metals, fuel, battery acid, lead acid, petroleum products, transmission fluid, solvents, infectious/bacterial contamination, asbestos, oil wastes and chemical residue. Clean Water Action believes that stormwater discharges from the Facility contain some or all of these pollutants.

20. A portion of the Attleboro municipal storm drain system runs under a portion of the Site. During periods of precipitation and/or snowmelt, the portion of the municipal storm drain system that runs under the Site contains runoff from offsite locations.

21.     Stormwater flows over the surfaces of the Site, collecting pollutants, and some of this stormwater discharges to the Attleboro municipal storm drain system via catch basins located on the Site.  Some of this stormwater also runs off of driveways on the Site into streets adjacent to the Site, where it flows into the municipal storm drain system via catch basins located on the streets. Stormwater from the Site that runs into the municipal storm drain system via catch basins on the Site and in the streets discharges to the Blackstone River via one or more of its tributaries.

22.     Pollutants are also carried around the Site and off the Site by truck and other vehicle tires, where these pollutants are carried by precipitation into catch basins on or near the facility, to Attleboro's municipal storm drain system, and thence to the Blackstone River via one or more of its tributaries.

23.     The management practices at the Site are wholly inadequate to prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.  The Site lacks sufficient structural controls such as settling basins, grading, berming or roofing to prevent rainfall and storm water flows from coming into contact with these and other sources of contaminants.  The Site lacks sufficient structural controls to prevent the discharge of water once contaminated.  The Site lacks an adequate system, such as a filtration system, to treat water once contaminated.  The Site lacks sufficient controls to prevent pollutants from being carried by truck and other vehicle tires to areas where they are exposed to rainfall and carried by precipitation into catch basins on or near the facility.

## FIRST CAUSE OF ACTION

Failure to Develop and Implement an Adequate Benchmark Monitoring Program;
Failure to Conduct Benchmark Monitoring
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342).

24.     Plaintiff re-alleges and incorporates Paragraphs 1-23, as if fully set forth herein.

25.     Defendant was and is required by the Stormwater Permit to monitor its stormwater discharges for compliance with Sector Specific Benchmark limitations applicable to scrap recycling facilities ("Benchmark Monitoring").  Stormwater Permit, pgs. 33-36, 102; *see also* 65 Fed. Reg. 64746, 64839 (Oct. 30, 2000).

26.     Between February 2002 and December 2008, Defendant was required to perform Benchmark Monitoring in accordance with the schedule set forth in 65 Fed. Reg. 64746, 64839 (Oct. 30, 2000).

27.     Since January 2009, Defendant is required by the Stormwater Permit to perform Benchmark Monitoring on a quarterly basis, beginning in the first full quarter following April 1, 2009.  Stormwater Permit, pgs. 33-36.  Accordingly, for 2009, Defendant is required by the Stormwater Permit to monitor its stormwater discharges for compliance with Sector Specific Benchmark limitations at least once in each of the following 3-month intervals:

    April 1 - June 30;

    July 1 - September 30; and

    October 1 - December 31.

28.     Defendant was and is required to conduct Benchmark Monitoring at each of its outfalls, except as otherwise exempt as a "substantially identical outfall."  Stormwater Permit, pg. 33.

29.     Defendant was and is required to conduct Benchmark Monitoring at each of its facility driveways and other street access points where stormwater leaves the Site.  EPA, Industrial Stormwater Monitoring and Sampling Guide (March 2009)("EPA Monitoring and Sampling Guide"), pg. 6.

30.     Defendant was and is required to conduct Benchmark Monitoring where the stormwater exits the facility, before the discharges mix with stormwater from off-site locations.  EPA FORM 3510-6 (Revised 09-2008)(Instructions for Completing the Notice of Intent for Stormwater Discharges Associated with Industrial Activity under the Multi-Sector General Permit), pg. 6 of 7; EPA Monitoring and Sampling Guide, pg. 4.

31.     Defendant was and is required to conduct Benchmark Monitoring before the discharges mix with stormwater from sources upstream of the Site.  Stormwater Permit, pg. 33; EPA Monitoring and Sampling Guide, pg. 6.

32.     At no time between February 2002 and October 24, 2009 has Defendant conducted any monitoring of its stormwater.  Defendant did conduct some monitoring on October 24, 2009.  The monitoring conducted by Defendant in October 2009 did not comply with the Stormwater Permit

monitoring requirements.  At no time since February 2002 has Defendant performed Benchmark Monitoring as required by the Stormwater Permit.

33.     Defendant has not performed Benchmark Monitoring at a location where the stormwater exits the facility, at a point before the discharges mix with stormwater from off-site sources.

34.     Defendant has not performed Benchmark Monitoring at a point before the discharges mix with stormwater being discharged from sources upstream of the Site.

35.     Defendant has not performed Benchmark Monitoring of discharges from its driveways and other street access points.

36.     Each day since November 23, 2004 that Defendant has failed to develop and implement an adequate Benchmark Monitoring program for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

37.     The absence of requisite Benchmark Monitoring results are ongoing and continuous violations of the Act.

## SECOND CAUSE OF ACTION

Failure to Submit Sector Specific Benchmark Monitoring Reports to EPA
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342).

38.     Plaintiff re-alleges and incorporates Paragraphs 1-37, inclusive, as if fully set forth herein.

39.     Defendant was and is required to submit Benchmark Monitoring results to EPA in accordance with the terms of the Stormwater Permit.  Defendant's reports to EPA are to be signed by Defendant's Principal Executive Officer or Authorized Agent, who must certify as follows:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gathered and evaluated the information submitted. Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete. I am aware that there are significant penalties for submitting false information, including the possibility of fine and imprisonment for knowing violations.

40.     Between February 2002 and December 2008, Defendant was required to submit reports on its Benchmark Monitoring to EPA in accordance with the schedule set forth in 65 Fed. Reg. 64746, 64816-17 (Oct. 30, 2000).

41. Since January 2009, Defendant is required to provide EPA with Benchmark Monitoring results no later than 30 days after Defendant received laboratory results for each quarter that it is required to conduct Benchmark Monitoring. Stormwater Permit, pg. 41. The quarters in which Defendant is required to conduct Benchmark Monitoring in 2009 are set forth in paragraph 27, above. Accordingly, for 2009, Defendant is required by the Stormwater Permit to submit to EPA Benchmark Monitoring results by no later than 30 days after receiving laboratory results of Benchmark Monitoring during the following quarters:

    April 1 - June 30;

    July 1 - September 30; and

    October 1 - December 31.

42. At no time since February 2002 has Defendant submitted any Benchmark Monitoring reports to EPA, as required by the Stormwater Permit.

43. Each day since November 23, 2004 that Defendant has failed to develop and implement an adequate Benchmark Reporting program for the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

44. Defendants' repeated failures to submit Benchmark Monitoring results to EPA constitute ongoing and continuous violations of the Act.

### THIRD CAUSE OF ACTION

Failure to Implement Necessary Pollutant Control Measures
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342).

45. Plaintiff re-alleges and incorporates Paragraphs 1-44, inclusive, as if fully set forth herein.

46. Plaintiff was and is required to reduce and/or eliminate pollutants to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice. Stormwater Permit, pg. 12. *See* 65 Fed. Reg. 64759.

47. Defendant has not reduced and/or eliminated pollutants in its stormwater discharges to the extent achievable using control measures that are technologically available and economically practicable and achievable in light of best industry practice. Defendant's failure to comply with this requirement is evidenced by Defendant's outdoor storage of materials, including raw, process and

waste materials, without appropriate best management practices, including good housekeeping practices; the continued exposure of significant quantities of raw, process and waste materials to storm water flows; the failure to either treat storm water prior to discharge or to implement effective containment practices; and the continued migration of pollutants off of Defendant's property into adjacent streets.

48.     Each day since November 23, 2004 that Defendant has failed to implement appropriate control measures as required by the Stormwater Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

49.     Defendants' repeated failures to implement appropriate control measures constitute ongoing and continuous violations of the Act.

## RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

1.      Declare Defendant to have violated and to be in violation of the Act as alleged herein;

2.      Enjoin Defendant from discharging pollutants from the Facility and to the municipal storm drain system underneath, surrounding and downstream from the Facility;

3.      Require Defendant to implement the requirements of the Stormwater Permit;

4.      Order Defendant to pay civil penalties of up to $32,500 a day for each violation on before January 12, 2009, and up to $37,500 per day of violation for violations after that date;

5.      Order Defendant to take appropriate actions to restore the quality of surface waters impaired by its activities;

6.      Award Plaintiff's costs (including reasonable investigative, attorney, witness, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and

7.      Award any such other and further relief as this Court may deem appropriate.

## PLAINTIFF'S CORPORATE DISCLOSURE STATEMENT

Clean Water Action is a corporation with no parent corporation. No publicly held company owns 10% or more of the stock of Clean Water Action.

Dated: November 23, 2009

Respectfully submitted,

*Nora J. Chorover*
NORA J. CHOROVER (Bar No. 547352)
Stern, Shapiro, Weissberg & Garin, LLP
90 Canal Street, 5th Fl.
Boston, MA 02114
Phone: 617-742-5800
Fax:    617-742-5858

Attorneys for Plaintiff
CLEAN WATER ACTION